Filed 9/20/21  In re K.R. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re K.R., a Person Coming Under the Juvenile Court Law. | |
| | D078966 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J520647) |
| v. | |
| K.R., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel for Plaintiff and Respondent.

Noncustodial father, K.R. (Father), appeals from juvenile court orders regarding placement and visitation of his minor son, K.R. (Isaiah), after removal of the minor from his mother's custody.[1]  Father contends:  (1) there was no substantial evidence to support the court's finding that placement of Isaiah with him would be detrimental, and (2) the court abused its discretion by improperly delegating and failing to enforce visitation when Isaiah refused to participate.  The San Diego County Health and Human Services Agency (Agency) maintains the court's orders were supported by the record and appropriate.  We agree, and affirm.

## I.

## PROCEDURAL AND FACTUAL BACKGROUND

A.  *Family Background*

Isaiah was born in January 2009.  Mother also has an adult daughter, N.T.  Father has six older children, and lost parental rights to three of them in previous dependency proceedings.

Father's last contact with Isaiah was in 2014, when the minor was four or five years old.  At that time, Isaiah had been living with Father at St. Vincent de Paul shelter for about a year, but after Father had to leave the shelter, he thought it was best for Isaiah to stay with Mother and the maternal grandmother, Ethel H.  Father said he returned to pick Isaiah up; however, Mother would not give him back, she changed her number, and Father lost contact with them.

---

[1]    K.R.'s mother, Kimberly H. (Mother) is not a party to this appeal, and we discuss her only as needed.  K.R. prefers his middle name, Isaiah; the record uses this name at various points; and we use it as well.

By the time this dependency case commenced, Mother and Isaiah lived in an apartment together, N.T. lived with the maternal grandmother, and Father resided in Minnesota with his wife, Katrina P.

B. *Investigation and Detention*

In December 2020, the Agency received a referral alleging Mother abused substances and Isaiah was exposed to unsafe and inappropriate adults. In January 2021, the Agency filed a petition under Welfare and Institutions Code section 300, subdivision (b)(1).[2] The petition alleged Isaiah was at substantial risk of harm, citing Mother's failure to protect him from inappropriate adults, testing positive for methamphetamine, and her prior drug use.

The detention report, filed in early February 2021, provided input from Isaiah, then age 12, the maternal family, and Father and his wife.

Isaiah had talked to a social worker in late December, and denied any worries about Mother. But, he said he "did not feel comfortable talking about" Father and "does not like" him. He also said he "does not have any contact" with Father and did not recall the last time he did; he later thought it was when he was four years old. Isaiah talked further with the social worker in January. He said he felt unsafe with Father and Father's family, and "most safe" with his grandmother. The report also noted he did weekly therapy via Zoom, and addressed school. During in-person school (i.e., before the pandemic), he was in a group to learn self-regulation skills due to attendance and bickering problems, but was doing better in the current school year with school citizenship, did not have an IEP (individualized education program), and would be assessed to make sure he was on track for

---

[2]     Further statutory references are to the Welfare and Institutions Code.

middle school. The school social worker reported he was "very friendly once you connect with him."

The maternal grandmother had been in Isaiah's life since birth, Isaiah and Mother lived with her three years earlier, and she saw him once or twice a week. She said Isaiah "would not report anything to her as he is well coached by Mother. . . ." As for Father, she said he "hasn't seen the child since he was three or four" and "was never really in his life." She and Isaiah's adult sister also stated there was "abuse in [Father's] care" and Isaiah "would cry when he would have to go with [him]." Mother was "adamant that [Father] physically, emotionally, and sexually abused the child in the past."

Father and his wife had a three bedroom house, and he had been employed for a year and four months. Father said he did not know where Mother lived or have her number, but he heard from relatives who had seen her. When asked about the abuse allegations, Father and his wife denied them and he suggested Mother was "making false allegations" to get custody. Father also denied recent child welfare history, involvement with law enforcement, or drug use. His records reflected a lengthy criminal history, but he had been law abiding since 2014. Father later admitted to domestic violence with Mother.

The Agency recommended out-of-home detention and supervised visitation for both parents, and said it would "further assess [Father's] ability to protect and care for his son."

At the detention hearing, County counsel addressed visitation with Father, stating the Agency "understands Isaiah has a lot of concerns and fears" and its "plan would be to start that contact in a slow process with phone calls." Isaiah's counsel opposed placement and sought a finding that

4

visitation would be detrimental. She explained he becomes "extremely upset [with] just the mentioning of [Father's] name," and that during a virtual meeting, he was "visibly upset and crying" when asked about him. She also said Isaiah reported Father "used to beat him up and not feed him." Father's counsel argued Father used to have a good relationship with Isaiah, and he planned to request placement. The juvenile court detained Isaiah with the grandmother, stating it was the "least traumatizing option. . . ." The court ordered reasonable, liberal supervised visitation, and said it would need more information for a detriment finding to bar contact with Father.

C. *Jurisdiction and Disposition*

The Agency provided its jurisdiction and disposition report in late February 2021, with additional input from Isaiah and Father.

Isaiah told the social worker he did not "like his first name because that is his Father's name." When she asked why, he said, " 'I would rather not talk about him. It makes me really sad.' " Isaiah added this was " 'not because [Mother] said it, but because of my own personal reasons.' " He said Father had been calling him, but "was told that it was his choice and he chooses not to talk to him." Father later indicated it was Isaiah's counsel who told him that he had a choice as to whether to speak with Father. Isaiah described his relationship with Mother and her family positively, and said he could talk to them "about anything." He noted he has one friend at his grandmother's home, and is not allowed to play with him because she said he is a " 'bad influence.' " Isaiah later said he has friends at Mother's home.[3]

---

[3] Isaiah noted these other friends in testimony by declaration submitted at the jurisdiction and disposition hearing.

Father wanted to regain custody of Isaiah, and reiterated that he had been unable to contact him.  He also stated that "things [were] being played to say that [Isaiah] [was] at 'great danger' because he has not had contact with him 'for a year' and [Isaiah] would be 'mentally' impacted," but " 'we can do counseling.' "  Father said he talked with the maternal grandmother about the "importance of encouraging [Isaiah] to speak with him."

The Agency recommended the juvenile court continue disposition so it could complete an assessment of Isaiah's best interests, including whether Father could have placement.

At the initial jurisdiction hearing in February, Father's counsel said he had "concerns about [Isaiah's] statements against him," stating Father denied the allegations and was concerned Mother was "maybe feeding this information" to Isaiah.  Father also asked for service referrals, and for Isaiah to be assessed for "trauma informed therapy."  The court continued the hearing, and asked the Agency to assess Isaiah for therapy.

In March 2021, the Agency provided an addendum report to the court with more information, and recommended against placement with Father.  Father had been in recovery for substance abuse since 2013 and had participated in counseling at the St. Vincent shelter.  St. Vincent confirmed he attended various sessions, including individual recovery counseling and parenting education.  Father did not feel he should do services, because he "completed [them] in the past, . . . parented his wife's children, [and] has stable housing and employment . . . ."  He did want Isaiah to attend counseling and would do conjoint counseling.  The grandmother told Father at a child and family team meeting that he "chose not to contact" Isaiah, as she had "continue[d] to reside in the same place . . . ."  She also reported that

6

Isaiah was doing well in her care. Isaiah still did not want to live with Father, and wanted to return to Mother.

The Agency determined placement with Father would be detrimental at this time. It explained Father had been absent from Isaiah's life for six years; Isaiah "emphatically voiced" he did not want to live with Father and declined to speak to him; and Isaiah expressed feeling " 'sad' " when talking about him. The Agency further explained that Isaiah was aware placement meant "losing . . . his current family, social and educational support network." The Agency felt Isaiah would benefit from counseling to address Father's absence and time to prepare to resume contact, and that both Isaiah and Father would benefit from counseling to address separation issues and rebuild their relationship. The Agency also stated it would need to complete an assessment under the Interstate Compact on the Placement of Children (ICPC) for Father's home and would want to see him in services.

At a further jurisdiction hearing in March 2021, Father stated he was seeking placement or expanded visitation. Isaiah's counsel indicated that Isaiah continued to assert Father used to beat him and not feed him, and he said Father was "a liar."

The Agency provided further addendum reports in May 2021. The social worker informed Father that his attorney had requested referrals, and the recommended services included parenting and conjoint therapy. Father disagreed with the recommended parenting services, stating he had parenting skills and, again, that he already did such services and helped raise his wife's kids. As for conjoint therapy, when the social worker explained this usually followed individual therapy, he denied having " 'psychiatric' issues" and said he did not need it. The social worker noted another barrier to conjoint therapy was that Isaiah did not want to talk to

him. Father responded that Isaiah was "not being encouraged to talk with him" and "should be told what to do." The social worker said she was "encouraging [Isaiah] to address with his therapist the concerns he has for not wanting to talk to or about" Father, and believed the caregivers were doing the same. The Agency also planned to address conjoint therapy at an upcoming team meeting.

The Agency's concerns persisted. It felt Father did "not seem to understand that [Isaiah] has valid reasons to decline speaking with or wanting to go with him." It was hopeful Isaiah would be "able to process in therapy . . . any abandonment related issues" or other reasons for not wanting a relationship, with the goal of "prepar[ing] him to resume [the] relationship . . . ."

The contested jurisdiction and disposition hearing was held in late May 2021. The juvenile court found by clear and convincing evidence that Isaiah should be removed from Mother's custody. The court then found it would be detrimental to place him with Father. The court acknowledged the case law that held a child's preference alone does not establish detriment, but it determined *In re A.C.* (2020) 54 Cal.App.5th 38 (*A.C.*), which affirmed a detriment finding based on multiple factors, was "most on point" and "very similar." The court explained it was "required to consider all relevant factors," and Isaiah's wishes were "not dispositive, but they are relevant." Accordingly, the court found Isaiah was "very bonded" to his Mother and bonded to his other maternal relatives; was "thriving" in the grandmother's home; and "repeatedly expressed" fear of Father and stated that he does not want to live out-of-state with him. The court further found there were abuse allegations that had not been fully investigated. The court concluded that,

8

"for all those reasons, at this point it would be detrimental to order Isaiah to be placed with [Father] with whom he does not have a current relationship."

The court confirmed the previous visitation order remained in place, authorized an ICPC assessment for Father's home, and asked the Agency to add to his case plan "a parenting class that can address parenting a traumatized teenager." Father timely appealed.

## II.

## DISCUSSION

A. *Substantial Evidence Supports The Juvenile Court's Detriment Finding and Denial of Placement with Father*

Father contends no substantial evidence supports the court's finding that placement with him would be detrimental. We disagree.

1. *Applicable Law*

When the juvenile court removes a child from a custodial parent at disposition, the court must determine "whether there is a parent of the child, with whom the child was not residing at the time . . . , who desires to assume custody of the child." (§ 361.2, subd. (a).) If the noncustodial parent requests custody, the court "shall place the child with the parent unless it finds that placement . . . would be detrimental to the safety, protection, or physical or emotional well-being of the child." (*Ibid*.) Detriment must be found by clear and convincing evidence, and the burden is on the party opposing placement to establish it. (*In re Karla C.* (2010) 186 Cal.App.4th 1236, 1243.)

"A detriment evaluation requires that the court weigh all relevant factors to determine if the child will suffer net harm." (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425 (*Luke M.*).) These factors include the dependent child's own wishes, which are relevant without being dispositive; the child's relationship with the noncustodial parent; and the child's relationship with

9

other family members.  (See *id.* at pp. 1426–1427; *A.C.*, *supra*, 54 Cal.App.5th at p. 43.)

We review the court's detriment finding for substantial evidence, bearing in mind the heightened clear and convincing evidence standard of proof.  (See *In re T.V.* (2013) 217 Cal.App.4th 126, 136; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996 (*O.B.*).)  When that standard applies, the question before the appellate court is "whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true."  (*O.B.*, at p. 1011.)  "In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence."  (*Id.* at pp. 1011–1012.)

2. *Analysis*

We disagree with Father that no substantial evidence supports the juvenile court's detriment finding, thereby denying him placement.

Considering the totality of the circumstances, ample evidence reflects placement with Father would be detrimental to Isaiah's emotional well-being.  Critically, Isaiah had a strong, negative emotional reaction to Father.  He expressed fear of him and believed Father had beaten and not fed him; he refused telephone visits; and he consistently and expressly stated he did not want to live with him.  Indeed, Isaiah said even *talking about* Father made him sad.  This emotional response was acknowledged by those around the minor, including the maternal grandmother, the social worker, and Isaiah's attorney.  Indeed, Father's own counsel requested Isaiah be assessed for trauma therapy.  True, the abuse allegations were still being investigated

10

and Father disputes them.  But whether such conduct was real or perceived, Isaiah *believed* it occurred.  The juvenile court reasonably could find Isaiah's fear and sadness in response to Father genuine, whatever its source.  (See, e.g., *Luke M.*, *supra*, 107 Cal.App.4th at p. 1425 [detriment finding supported by "emotional harm . . . from . . . loss of sibling relationships"]; *A.C.*, *supra*, 54 Cal.App.5th at p. 46 [minor "would suffer significant emotional harm" if placed with father].)

Isaiah's lack of a relationship with Father, and strong bonds with the maternal family, also support the detriment finding.  Father had been absent from Isaiah's life for years, and they had no present relationship.  (Compare *In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1258 [although minor did not want to move to father's home, he had "great week" visiting him; he and father spent time "conversing freely"; and he said it was "not that bad" at father's home].)  Father's characterization of the separation—including claiming he had no way to contact Isaiah and at one point suggesting it lasted only a year—illustrates his lack of insight into the significance of the separation and its effect on Isaiah.  Father's lack of insight, and of empathy for his son's feelings, is underscored by Father's comment that Isaiah "should be told what to do."  In contrast, there was evidence Isaiah was strongly bonded with Mother and wanted to return to her, was bonded with the maternal family, and was thriving in the grandmother's home.  (Cf. *Luke M.*, *supra*, 107 Cal.App.4th at p. 1425 [sibling bonds support detriment finding].)

The juvenile court's reliance on *A.C.* was sound.  Similar to Isaiah, the minor in *A.C.* was 12 years old, lived with her grandmother, and last had contact with her father, who lived out of state, five years earlier.  (*A.C.*, *supra*, 54 Cal.App.5th at pp. 40, 44.)  This minor, too, had a negative emotional reaction to her father, while being comfortable with her maternal

11

family and life. Under those circumstances, the juvenile court found placement with the father would be detrimental. (*Id.* at pp. 43–44 [minor feared leaving her life to be with father, leading to anxiety and impacted sleep; wanted to reunify with mother and was bonded with family; and had many friends and did well in school]; *id.* at p. 41 [therapist and multidisciplinary assessment team felt moving her would cause emotional detriment].) The Court of Appeal affirmed, rejecting the father's arguments that the minor's wishes were not dispositive and that the juvenile court relied either on the absence of a relationship or an impermissible mix of factors. (*Id.* at p. 43.) The court explained the minor's wishes were still relevant, the basis for the detriment finding was that she "would experience something akin to trauma" if placed with the father, and the evidence amply supported detriment. (*Ibid.*)

Father's attempt to distinguish *A.C.* is unpersuasive. He contends there was "no information about how [Isaiah] was doing in school" and he had "only one friend" he could not play with; there was no evidence he "was so worried" it impacted his routine or sleep; and there was no evidence from therapists or a multidisciplinary team, whereas the Agency's view was based on Isaiah's rejection of contact and placement. This argument overemphasizes minor differences between the two cases concerning schooling and friends (and the record does reflect Isaiah was doing fine at school, and had friends at Mother's home); it ignores important similarities, such as both fathers being absent from the minors' lives for many years and living out of state; and it minimizes the evidence in the record regarding Isaiah's negative emotional response to Father. For example, Isaiah reported to the social worker that talking about Father made him sad, and the Agency was hopeful he could address abandonment issues in therapy. The juvenile

12

court was entitled to credit and rely on this evidence. (See *Luke M.*, *supra*, 107 Cal.App.4th at p. 1427 [rejecting father's argument that social worker's opinion was insufficient evidence on sibling bond issue]; cf. *In re Casey D.* (1999) 70 Cal.App.4th 38, 53 [court was "entitled to find the social worker credible" on beneficial parent-child relationship exception], disapproved on other grounds in *In re Caden C.* (2021) 11 Cal.5th 614.)

Father's other arguments are unpersuasive as well. First, he contends a "child's wishes to remain with maternal grandparents and a lack of an established relationship with a noncustodial parent" are "not necessarily sufficient to constitute substantial evidence" for a detriment finding. As with his argument regarding *A.C.*, Father disregards key evidence. And, unlike *A.C.*, his cases are distinguishable. (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1404 [reversing detriment finding for minor who said father missed 11 years of her life and feared release to him, where he provided financial support, they spoke on the phone, and she saw him on weekends and holidays; he also did not live "halfway across the country," and there was no indication of strong bond with sibling]; *In re John M.* (2006) 141 Cal.App.4th 1564, 1567–1568, 1570–1571 [reversing order finding placement would be detrimental where, among other things, child's wishes "were unclear"; father had been back in the child's life for a year before the petition, and was "not to blame" for lack of contact; and there was no discussion of minor's bond with family].)

Second, Father argues it was "not clear . . . why [Isaiah] wanted nothing to do with" him, stating Isaiah initially said he could not recall when he last had contact with Father and only later reported Father beat him and did not feed him. He argues, in turn, that the shelter would have made a referral if these events took place; Mother's prior abuse allegations were found unsubstantiated; and the grandmother acknowledged Isaiah was "well

coached" by Mother. To the extent Father is suggesting the only reason Isaiah would reject contact with him after a *six year* absence is prior abuse, he validates the Agency's concern that he did not grasp Isaiah had legitimate reasons—real or perceived—to decline contact. And Father's efforts to discount abuse allegations are beside the point; as discussed above, Isaiah's fear was real, whether the abuse happened or not.

Finally, Father expresses concern that the juvenile court could later deny him return of custody under a preponderance of the evidence standard, leading to termination of his parental rights. He cites no cases holding that future dependency proceedings are relevant to whether substantial evidence supports a finding that placement is detrimental. Nor does he establish placement at this time even *would* aid reunification, given Isaiah's emotional state and Father's reluctance to participate in individual counseling and parenting classes. (Cf. *In re Matthew C.* (2017) 9 Cal.App.5th 1090, 1102 (*Matthew C.*) [noting it "seems exceedingly unlikely" that "emotionally traumatic visits" would "do anything to advance a parent's reunification prospects, and, indeed, they might very well derail them"].)[4]

B. *The Visitation Order Was Not an Abuse of Discretion*

Father argues the juvenile court's visitation order was an abuse of discretion. This contention lacks merit, too.

---

[4] Father also contends he could provide a safe home and that there were reasonable means to protect Isaiah in his custody. Father's burden is to show a lack of evidence for the order rejecting placement actually made, not evidence in support of a different order. (Cf. *Luke M.*, *supra*, 107 Cal.App.4th at p. 1425 [§ 361.2 "does *not* require that the court find the noncustodial parent might fail to protect the child"].)

1. *Applicable Law*

The juvenile court "has the power and responsibility to define a noncustodial parent's right to visit with his or her child after the minor has been adjudged a dependent child of the court and has been removed from parental custody." (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1373 (*Moriah T.*); *In re D.P.* (2020) 44 Cal.App.5th 1058, 1070 (*D.P.*) [accord].) The court need not "specify all the details," and may delegate to the social worker the "responsibility to manage the details of visitation, including time, place and manner thereof." (*Moriah T.*, at pp. 1374–1375.) The juvenile court's "power to regulate visits between dependent children and their parents . . . will not be disturbed on appeal absent an abuse of discretion." (*D.P.*, at p. 1070.)

2. *Analysis*

We begin with the Agency's claim that Father forfeited his arguments regarding the visitation order, and then turn to Father's contentions.

As an initial matter, we acknowledge Father did not challenge the visitation order in the juvenile court, which could support forfeiture. (See *In re Dakota H.* (2005) 132 Cal.App.4th 212, 221–222.) However, "application of the forfeiture rule is not automatic." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293; see *ibid.* [reviewing court did not abuse discretion in reaching mother's challenge to visitation order that presented important legal issue], superseded by statute on other grounds as stated in *In re M.R.* (2005) 132 Cal.App.4th 269.) We elect to address the visitation order on the merits.

Turning to that order, the record does not show any abuse of discretion by the juvenile court. (See *D.P.*, *supra*, 44 Cal.App.5th at p. 1070.) The court granted Father visitation, over the objection of Isaiah's counsel. Visits were set to commence by telephone, but had not yet taken place because Isaiah

15

refused to speak to Father. Although Father expressed concern that the maternal family did not encourage visits and sought expanded visitation as an alternative to placement, Father never explicitly requested the juvenile court enforce visits, never asked for other ways to interact with Isaiah (e.g., sending letters), and did not object when the court said at disposition that the existing visitation order would stay in place. The social worker nonetheless encouraged Isaiah to discuss his concerns about Father in therapy, and urged Father to participate in services that could improve their relationship. None of this reflects error.

Father's position again lacks force: focusing on Isaiah's refusal to participate in visits, he suggests this amounts to both improper delegation and erroneous lack of enforcement. Neither approach has merit.

First, Father argues Isaiah said "he was told it was up to him" whether to do visits, and it was "error for the court to delegate its authority" to Isaiah. He explains that "[a]lthough the court did not specifically state it was giving [Isaiah] authority to decide if visits with [Father] occurred," it knew he was refusing visits and did nothing to ensure visits would take place. To be clear, the juvenile court did *not* give Isaiah discretion over visits. The court ordered visitation, and Isaiah declined to participate. Moreover, it appears it was Isaiah's counsel who told him he had a choice whether to participate in calls with Father—not the court. In any event, Father does not establish failure to ensure visits amounts to improper delegation. (See *Moriah T.*, *supra*, 23 Cal.App.4th at p. 1374 [visitation order violates statutory scheme only when it "delegates . . . absolute discretion to determine whether any visitation occurs"]; cf. *In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1046 (*Sofia M.*) [rejecting case that found visitation order erroneously was not enforced

16

because minor refused contact; stating this analysis "risks conflating two distinct issues: the propriety of the order, and its enforcement"].)

Father's reliance on *Julie M.* is misplaced, as the juvenile court there *did* give the "children absolute discretion to decide whether [their mother] could visit them" and "essentially delegated judicial power to the children." (*Julie M.*, *supra*, 69 Cal.App.4th at p. 48; see p. 46 [juvenile court initially agreed with therapist that visits with mother should continue over minors' objection, but after mother "abruptly" left courtroom during hearing, court "gave [the minors] the option to consent to, or refuse, any future visits"].) The other cases cited by Father are likewise distinguishable, or consistent with the court's order. (See *In re Korbin Z.* (2016) 3 Cal.App.5th 511, 516, 520 [juvenile court improperly ordered agency to "facilitate monitored visits . . . at [the minor's] discretion"]; *In re T.H.* (2010) 190 Cal.App.4th 1119, 1123 [juvenile court indicated visitation would occur "upon the 'agreement of the parents,'" which let mother limit visits with father]; *In re Kyle E.* (2010) 185 Cal.App.4th 1130, 1136 [decision whether visitation would occur was improperly delegated to agency]; cf. *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1009 [order for father to have "reasonable" supervised visits was not improper delegation to agency; "[w]hile the order [was] 'bare bones,' it constitutes a determination that visitation . . . should occur"].)

Second, Father argues the juvenile court "found visitation would not be detrimental" and "[s]o, it was essential that the court enforce its visitation order . . . ." We are not persuaded.

*Sofia M.*, *supra*, 24 Cal.App.5th 1038, is instructive. There, the juvenile court ordered visitation; the minor later refused to participate, despite the court granting the mother's request for visits in a therapeutic setting and allowing her to write letters; and the mother unsuccessfully

17

argued at the section 366.26 hearing that the court failed to enforce visitation and filed a section 388 petition to reinstate services. (*Id.* at pp. 1041–1043.) The Court of Appeal affirmed termination of parental rights, and rejected the argument that the juvenile court failed to enforce visitation. (*Id.* at p. 1044.) It disagreed "the *court errs* when the *child* refuses a proper visitation order," stating: "When a child refuses visitation, it is the parent's burden to request a specific type of enforcement, or a specific change to the visitation order. Absent a request, it is not the court's burden to sua sponte come up with a solution to the intractable problem of a child's steadfast refusal to visit a parent." (*Id.* at p. 1046.) Here, Father did not even request further visitation measures from the juvenile court, nor was he amenable to the social worker's suggestions for services that might promote his relationship with Isaiah. For example, he did not want to do the individual counseling that typically precedes conjoint therapy.

Finally, Father again focuses on reunification, contending a lack of visitation will impact whether services are terminated and lead to termination of parental rights. Although visitation is a "key element of reunification," the juvenile court still "must focus on the best interests of the children"—which includes "the 'possibility of adverse psychological consequences of an unwanted visit between [parent] and child.' " (*Julie M.*, *supra*, 69 Cal.App.4th at pp. 49–50; see *In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1233, 1237 [upholding order stating visitation was at discretion of agency and minors; "this means the children should not be forced to visit . . . against their will"]; cf. *In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1357 [court has "power to suspend visits when continuing them would be harmful to a child's emotional well-being"].) Further, as noted, Father has not shown that contact with a child who is not emotionally

18

ready to visit with him actually advances reunification. (See *Matthew C.*, *supra*, 9 Cal.App.5th at p. 1102.)

We acknowledge that visitation is relevant to whether a parent can avoid termination of parental rights in juvenile dependency proceedings. (See § 366.26, subd. (c)(1)(B)(i) [beneficial parent-child relationship exception to adoption turns, in part, on "regular visitation and contact" with minor].) However, Father could mitigate that concern by participating in the recommended services, where he could learn skills to rebuild his relationship with Isaiah and visits could begin. (See *In re T.M.* (2016) 4 Cal.App.5th 1214, 1220 [affirming order "requiring progress in individual counseling and assurance of the minor's safety prior to allowing visitation"; "during reunification there will be subsequent hearings, and therefore ample opportunity for the juvenile court to revisit the appropriateness of visitation in light of new circumstances, including progress in individual counseling"].)

In conclusion, we perceive no error in the court's placement and visitation orders.

## DISPOSITION

The orders are affirmed.

IRION, J.

WE CONCUR:

AARON, Acting P. J.

GUERRERO, J.